IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TANA R. CUMMINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2002-cv-4201-JPG |
| ) | |
| STATE OF ILLINOIS, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

**GILBERT, District Judge:**

This matter comes before the Court on the parties' cross motions for summary judgment. The pleadings relevant to this Order include plaintiff Tana Cummins' motion for summary judgment (Doc. 172), defendant State of Illinois' response (Docs. 173 and 178) and Cummins' reply to that motion (Doc. 183); Illinois' motion and memorandum of law in support of summary judgment (Doc. 167), Cummins' opposition (Doc. 174) and Illinois' reply (Doc. 180); and Illinois' motion for leave to cite additional authority (Doc. 185) and Cummins' response to that motion. (Doc. 186). For the reasons set forth below, summary judgment will be GRANTED in Illinois' favor.

This is an employment discrimination case, albeit not your standard fare. Plaintiff Tana Cummins is a mental health technician at the Choate Mental Health Center in Anna, Illinois. As her name suggests, she's female; and that's an important fact here, given that she's accused the State of Illinois, her employer, of sexual

discrimination.  Such conduct, if true, is of course proscribed by Title VII of the Civil Rights Act of 1964.  See 42 U.S.C. §2000e et seq.  Like many employers, Illinois offers health insurance to its employees as part of the terms and conditions of employment.  Because Illinois allows employees to choose among several benefit plans, the specific coverage extended to each individual varies to some extent, though not in any way relevant to this case.  Differences aside, the plans do share one common exclusion, and that exclusion *is* relevant to this case.  It provides: "Family planning exclusions include, but are not limited to, . . . [a]ny drug or device prescribed or used for the purpose of contraception."  For what it's worth, the plan covers both tubal ligations and vasectomies, both *surgical* methods of "family planning," though the plan excludes "[c]harges for services relating to the reversal" of those procedures.  Thus, Cummins states her bottom line in this case accordingly: "Because prescription contraceptives are excluded by the State of Illinois Quality Health Care Plan, [she] must pay out-of-pocket for her prescription contraceptives or risk the physical, emotional and financial costs of an unplanned pregnancy."  She therefore seeks damages and an injunction stopping the allegedly discriminatory practice, though the latter form of relief has since become moot with the passage of 215 ILCS 5/356z.4, an Illinois statute effectively extending coverage for oral contraceptives to female employees like Cummins.  By Cummins' count, as many as 60,000 other (female) employees of Illinois are also affected by this problem.  The Court therefore certified this case as a class action consisting of "[a]ll current and former female employees of the State of Illinois from August 31, 2000, to date of final

judgment who were provided a health benefits plan as part of their employment that excluded contraceptive medication from health insurance coverage" and appointed Cummins class representative. With that in mind let's now turn to the instant motion.

There are two ways Cummins can prove sex discrimination in this case: one, by establishing that the policy exclusion at issue here disparately *treats* women employees relative to their male counterparts; or, two, by showing that the policy disparately *impacts* women employees–and again, this is a crucial point, as we'll see momentarily– that it does so in comparison to its effect on male employees. Cummins relies on both theories in this case, so let's take them one-by-one and in that order. The first, disparate treatment, is grounded in 42 U.S.C. §2000e-2(a)(1), a provision which makes it unlawful "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Granted, some folks might say that this language seems clear enough. But the law in general is never that easy, and applying this provision in particular has historically been tricky. The notion is most clearly expressed in *Los Angeles Dept. of Water & Power v. Manhart*. There, the U.S. Supreme Court explained that disparate treatment occurs when "each of the two groups of employees [being compared] is composed entirely and exclusively of members of the same sex." 435 U.S. 702, 716 (1978). Thus, in that case, so-called "facial" discrimination existed because "the Los Angeles Department of Water and Power required its female employees to make larger contributions to its pension fund

than its male employees." 435 U.S. at 704. Stated otherwise, the classification clearly placed women on one side of the fence and men on the other–or, under those facts, the line drawn was essentially "Women, you pay this; men, you pay that." So, too, with *Dothard v. Rawlinson*, a case which addressed Alabama Board of Corrections Administration Regulation 204. That rule "establish[ed] gender criteria for assigning correctional counselors to maximum-security institutions" for contact positions. 433 U.S. 321, 325 (1977). Again, the pattern was akin to saying something like, "Women, you can only work in this job; men, you may work in this job *and* that job." In *Manhart* terms, both classes excluded in those cases therefore consisted "entirely and exclusively of members of the same sex."

    Now, does the same situation exist in this case? No. That Illinois' health-benefits policy forms the basis for the classification here is undisputed. It excludes the class of insureds who use (or would like to use) "[a]ny drug or device prescribed or used for the purpose of contraception." True, the class so defined absolutely includes *women* employees taking *oral contraceptives*; for such drugs are unquestionably "drugs . . . prescribed . . . for the purpose of contraception." But the critical question is not what the class includes but rather whether the class consists "entirely and exclusively of members of the same sex," which in this case is women. It doesn't. A condom, for example, is a "device . . . used for the purpose of contraception," and it's used exclusively by men. Therefore, the class of insureds excluded by this policy consists of *both* women *and* men and fails under *Manhart*.

That said, the thrust of Cummins' argument on this score concerns the Pregnancy Discrimination Act's impact on Title VII. See 42 U.S.C. §2000e(k). It is therefore critical for us to clearly understand her position. On this she writes, "The PDA does not define the instant class or group of people, but rather prohibits a type of discriminatory conduct by an employer." (Doc. 174 at 10). Thus, what she seems to be saying is that the PDA expanded an employer's liability under Title VII as opposed to merely redefining "the instant class or group of people." Based on the controlling Supreme Court case law interpreting this provision, however, the Court disagrees.

Identification of the classes created by an employment policy or practice has consistently been the first step in any disparate treatment analysis. As we'll see throughout this discussion, all of the controlling cases in this area agree on at least that much, and, indeed, it's this fact that ultimately dooms Cummins' argument, for in the end the PDA is merely an expression of congressional dissatisfaction with the Supreme Court's definition of the classes created by the employment policies at issue in *Geduldig v. Aiello*, 417 U.S. 484 (1974), and *General Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), not an expansion of the "type of discriminatory conduct [prohibited] by an employer." In fact, we'll see that once the relevant classes are identified, the cases always apply *Manhart* (however formulated) to determine if those classes are comprised "entirely and exclusively of members of the same sex." (*Manhart* was decided after these cases.) If the answer is yes, the case is analogous to *Manhart* and *Dothard* and the policy in question is facially discriminatory. The opposite is true if the answer is otherwise.

So let's first consider *Geduldig v. Aiello*, a case in which the Supreme Court found the State of California's exclusion of pregnancy-related disability benefits under a plan providing comprehensive coverage for all other non-occupational disabilities consistent with the Equal Protection Clause. Notably, the Court viewed the classes created by that exclusion–i.e., the exclusion of disability benefits for time off related to pregnancy–as "pregnant women" versus "nonpregnant persons." 417 U.S. at n. 20. So viewed, the Court found that the plan at issue there didn't discriminate "based on gender as such" and therefore wasn't "facially" discriminatory because "[w]hile the first group [pregnant women] is exclusively female, the second [nonpregnant persons] includes members of both sexes." 417 U.S. at n. 20. In other words, the classes created by that policy didn't consist "entirely and exclusively of members of the same sex," for the class of "nonpregnant persons" at any given time necessarily includes *both* males *and* females. Not *all* females are *always* pregnant.

*General Elec. Co. v. Gilbert*, 429 U.S. 125, as we've said, is the other important case–and one which, carefully read, is particularly critical to a proper understanding of the scope PDA. Decided two years after *Geduldig*, *Gilbert* addressed whether the exclusion of health-insurance benefits for costs associated with pregnancy was unlawful under Title VII. Notably, the employer in that case offered an otherwise comprehensive non-occupational sickness and accident plan–"comprehensive," that is, save pregnancy. Although *Gilbert* was a Title VII case, not an Equal Protection case like *Geduldig*, the Court nevertheless adopted *Geduldig's* view of the classes created by that exclusion and

held that the relevant classes likewise consisted of "pregnant women" and "nonpregnant persons," 429 U.S. at 134-135, and because the latter included both males and females, as in *Geduldig*, the policy wasn't therefore facially discriminatory. Justice Stevens in dissent disagreed with that formulation, and his reasoning is critical here.

> It is not accurate to describe the program as dividing potential recipients into two groups–pregnant women and nonpregnant persons. [citation and internal quotation omitted] Insurance programs, company policies, and employment contracts all deal with future risks rather than historic facts. The classification is between persons who face a risk of pregnancy and those who do not.

429 U.S. at n. 5 (Stevens, J., dissenting). Thus, given that, "it is the capacity to become pregnant which primarily differentiates the female from the male," 429 U.S. at 162, Justice Stevens found the *Gilbert* plan facially discriminatory–a result perfectly consistent with *Manhart*, for the class of persons with the capacity to become pregnant is comprised "entirely and exclusively of members of the same sex" vis-a-vis those not within that class (men). Congress, as we would later learn in *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678-679 (1983), agreed with Justice Stevens and enacted the PDA to overrule *Gilbert*. The PDA provides: "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefit programs under fringe benefit programs, as other persons not so affected but similar in their ability or inability

to work. . . ." Viewed in this context, it's unremarkable that, when describing the scope of the PDA in *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, the Supreme Court wrote: "The Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, discrimination based on a women's pregnancy is, *on its face*, discrimination because of her sex." 462 U.S. at 684 (emphasis mine). Congress can't overrule the Supreme Court on a question of constitutional law, so it was powerless to change the classification drawn by the Court in *Geduldig*–again, a matter of constitutional law. But Congress emphatically *could* change the interpretation to be accorded Title VII–a federal statute–and that's exactly what it did by enacting the PDA. It filled in the hole created by *Geduldig* with the commonsense notion "that since only women can become pregnant, discrimination against pregnant people is necessarily discrimination against women." *Newport News*, 462 U.S. at n. 17. Or, as *Manhart* would say, Congress reiterated the notion that the class of those subject to the risk of pregnancy, compared to those outside that class, consists "entirely and exclusively of members of the same sex."

Cummins argues in this case, however, that "[t]he PDA does not define the instant class or group of people, but rather prohibits a type of discriminatory conduct by an employer." But as we've just seen, that's simply incorrect. The PDA provides that disparate treatment of women "affected by pregnancy, childbirth, or related medical conditions" is discrimination "because of sex." Placed in its proper context, that language emphatically "define[s] the instant class or group of people," and it's wrong to think otherwise. To be sure, the language "related medical conditions" might

suggest a broader reach. But such an interpretation would be irreconcilable not only with the circumstances surrounding the PDA's enactment, as discussed above, but also with the Supreme Court's own understanding of that provision. Consider *Int'l Union, UAW v. Johnson Controls*, 499 U.S. 187 (1991), a case in which the Supreme Court found a classification separating "women who are pregnant or who are capable of bearing children," from those who were not–i.e., men and "women . . . whose inability to bear children is medically documented," violative of Title VII. 499 U.S. at 192.[1] The Supreme Court explained its decision thus: "Johnson Controls' policy classifies on the basis of gender and childbearing capacity, *rather than fertility alone*." Thus, "[t]he bias in Johnson Controls' policy is obvious. *Fertile* men, *but not fertile women*, are given a choice as to whether they wish to risk their reproductive health for a particular job." 499 U.S. at 197-198 (emphasis added). Were Cummins' understanding of the PDA correct, the Supreme Court would have stopped dead in its tracks upon finding that the classification at issue there concerned "fertility," because, under her definition, "fertility" is a "medical condition" "related to" pregnancy. But the Supreme Court did no such thing; it explicitly identified the determinative factor *not* as the fact that the classification involved "fertility alone," but rather, because "fertile *men*" were treated differently than "fertile *women*." The classifications might just as well have separated "men with the flu" and "women with the flu." For what it's worth, the Court therefore

---

[1]The Supreme Court ultimately disagreed with the stated classification. It found that the policy at issue there separated employees into two classes: "fertile men" and "fertile women." Each class was therefore comprised "entirely and exclusively of members of the same sex."

rejects the holdings of two sister courts in this circuit for their failure to appreciate this distinction, see *Erickson v. Bd. of Governors of State Coll. and Univ.*, 911 F. Supp. 316 (N.D. Ill. 1995); *Pacourek v. Inland Steel Co.*, 858 F. Supp. 1393 (N.D. Ill. 1994), along with the oft-cited EEOC decision of December 14, 2000.  See Ernest F. Lidge III, *An Employer's Exclusion of Coverage for Contraceptive Drugs is not per se Sex Discrimination*, 76 TEMP. L. REV. 533, 561 (2003).

    *Geduldig* and its successors have also recognized an offshoot to claims of disparate treatment, which is in substance just another way of getting at the true definition of the relevant classes when those classes appear facially neutral.  Thus, "*Geduldig's* outcome was qualified by the explicit reservation of a case where it could be demonstrated that a pregnancy-centered differentiation is used as a 'mere pretext . . . designed to effect an invidious discrimination against the members of one sex.'" *Gilbert*, 429 U.S. at 149 (Brennan, J., dissenting) quoting *Geduldig*, 417 U.S. at 496-497 and n. 20.  This was the thrust of Justice Brennan's dissent in *Gilbert*, see 429 U.S. at 162 (Stevens, J., dissenting), and it bears a strong resemblance to the analytical approach developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a point we'll return to momentarily.  Cases define "pretext" as a "lie" or a "phony reason for some employment action by the employer." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1045 (7th Cir. 2000).  In *Gilbert,* Justice Brennan rejected three of the company's arguments as pretextual.  One, the company argued that the plan was nondiscriminatory because it excluded all "voluntary" disabilities.  (In *Geduldig* the

Supreme Court characterized pregnancy as such). But the problem with that notion, according to Justice Brennan, was that the plan admittedly covered such "voluntary" disabilities as those stemming from "sports injuries, attempted suicides, venereal disease, disabilities incurred in the commission of a crime or during a fight, and elective cosmetic surgery." 429 U.S. at 151 (Brennan, J., dissenting). Two, the company argued that the plan was limited to covering "disease." But in Justice Brennan's judgment that too failed because the policy excluded "the 10% of pregnancies that end in debilitating miscarriages . . . the 10% of cases where pregnancies are complicated by 'diseases' in the intuitive sense of the word . . . and cases where women recovering from childbirth are stricken by severe diseases unrelated to pregnancy." 429 U.S. at 151 (Brennan, J., dissenting). Three, the company argued that the plan covered conditions to the extent of the lowest common denominator (or perhaps, lowest common disease) applicable to both men and women: "There is no risk from which men are protected and women are not . . . [and] no risk from which women are protected and men are not." Justice Brennan still wasn't buying, however: "[A]ll mutually contractible risks are covered irrespective of gender [i.e., the flu] . . . [and] the plan also insures risks such as prostatectomies, vasectomies, and circumcisions that are specific to the reproductive system of men and for which there exist no female counterparts covered by the plan." 429 U.S. at 152 (Brennan, J., dissenting).

Conceptually, "*McDonnell Douglas* is designed to give the plaintiff a boost when he [or she] has no actual evidence of discrimination . . . but just some suspicious

circumstances." *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 643 (7th Cir. 2002). In this case, therefore, Cummins might say that although she's qualified to receive health benefits in the sense that she's both employed and enrolled in the Quality Health Care Plan–and of course she's female–she's been denied coverage for a benefit (i.e., oral contraceptives) ostensibly extended to members of the opposite sex. True enough, those would probably seem like "suspicious circumstances" to most folks. In the discrimination context, *McDonnell Douglas* requires, prima facie, a showing that the employee (1) is a member of a protected class, (2) who applied for and was qualified for, say, an employment position, (3) was rejected, and (4) the position went to a similarly situated individual outside the protected class. E.g., *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir. 2003). If in response the defendant does nothing, the employee is of course entitled to summary judgment, as an unrebutted inference of discrimination exists at that point. If, however, the employer asserts a legitimate, nondiscriminatory explanation for its conduct, the burden returns to the employee to show that the employer's proffered reason is merely a pretext for discrimination. *Zaccagnini*, 338 F.3d at 675. "Similarly situated," for its part, means "directly comparable . . . in all material respects." *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002). *McDonnell Douglas* is justified by the strong anti-discrimination policy reflected in Title VII and as such it may entitle a plaintiff to summary judgment on the strength of evidence insufficient in the normal case to support a verdict in the plaintiff's favor as a matter of law, see *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-252 (1986), in

that by establishing a prima facie case the plaintiff has presented evidence sufficient to eliminate "the two most common reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, n. 44 (1977).

If we apply those principles in the context of this case, here's how we might formulate our approach. We'd say that Cummins must establish: (1) she's a member of a protected class; (2) she applied for and was qualified to receive benefits under the health-insurance policy; (3) the claim was denied; and (4) the benefit was extended to male employees. If Cummins could establish these four factors, there's probably little room left for a nondiscriminatory reason. That's because the three "most common reasons" to deny health benefits seem to be (i) the employee isn't eligible, (ii) the employee didn't enroll, or (ii) the plan doesn't cover the "benefit" being asserted, and those concerns are subsumed within our prima facie criteria. "Common reasons" (i) and (ii), for their part, fall within prima facie (2), and the fact that Cummins meets (3) and (4) really isn't at issue in this case. Nor is (1) for that matter. So the real dispute we're left with is whether the "benefit" at issue here was in fact extended to males, and that requires us to initially define just what the "benefit" really is.

Cummins's suggestion along these lines is that the "benefit" we're concerned with in this case is prescription drugs in general. If that assertion is true, of course, she's established her prima facie case. That male employees received prescription drugs under the plan in question is undisputed. In the Court's view, however, the

-13-

classification Cummins draws is simply too broad to be a sound one. For one thing, the exclusion's language itself isn't limited to "prescription" contraception; it also includes "devices," a term which encompasses both condoms and contraceptive foam. But does that fact really make the exclusion non-pretexual, one might reasonably ask? After all, no one in this case claims that employees were *ever* denied coverage for condoms or contraceptive foam. No matter. "Fertility," when viewed as a medical "condition," is "treatable" by prescription drugs, to be sure, just as it's treatable both surgically–i.e., via tubal ligation or vasectomy–or non-surgically and without a prescription–i.e., condoms or contraceptive foam. True, the natural question then becomes why surgical procedures are covered to the exclusion of non-surgical ones. Insurance is designed, in the abstract, to compensate a policyholder or beneficiary for the economic consequences of a specific and well-defined event taking place. An automobile claim is warranted once an accident occurs. The same is true in this context, as benefits for appendicitis, for example, are payable when an appendectomy is performed.[2] Identifying the specific risk at issue thus defines the scope of the coverage; in this case, the risk guarded against is the costs associated with pregnancy. Benefits should therefore accrue when an insured becomes pregnant, i.e., when the covered risk materializes. That this plan

---

[2]This also explains why the emotional consequences of an unplanned pregnancy are largely irrelevant to the question at hand. This is not to say that such considerations aren't significant or important as a societal problem. This Court's 20-plus years' experience as a district judge and Illinois circuit judge suggest quite the opposite. But health insurance plans do not compensate a policyholder or beneficiary for the emotional distress attendant to sickness or disease; they merely pay the out-of-pocket expenses incurred by the insured. As such, those costs–and not emotional or societal costs–are the only costs relevant here

covers all such costs is undisputed in this case. Which brings us to the question we've posed concerning *preventative* measures, as opposed to post-event measures. Insurance plans, like all other business concerns, want to minimize their exposure to risk. Auto insurers gladly fix cracked windshields in the hope of avoiding the cost of replacing the entire windshield later. Again, the same concept applies here. It's sensible for a health insurer to cover flu shots, for example, because such vaccinations decrease the chance that an insured will actually contract the disease and therefore incur significantly greater costs later–costs the insurer has contracted to pay. So Illinois, for its part, could have sensibly found it beneficial to include surgical contraceptive procedures within the plan's coverage; such procedures significantly decrease the risk that pregnancy will occur and therefore reduce its exposure for those costs. By the same token, Illinois might have also concluded that the same level of certainty isn't attendant to oral contraceptives, and even less so with such "devices" as condoms, foam, IUDs, etc. At bottom, therefore, one cannot say that the line drawn by the policy exclusion in this case is irrational, or, more to the point, that it's "pretextual."

     Illinois, by contrast, argues that the plan at issue here excludes "benefits" for non-surgical methods of birth control for both sexes equally and is therefore non-discriminatory. This is related to the foregoing discussion. And whether formulated as a non-discriminatory reason (as in Justice Brennan's *Gilbert* dissent), or viewed within the context of element (4) of our reformulated *McDonnell Douglas* prima facie case, nothing suggests otherwise. Unlike the reasons rejected in *Gilbert*, male employees in

this case haven't been given "benefits" to prevent conception.  (No one argues that Viagra has that effect though it's often cited in Cummins' brief.)  The benefits excluded from both sexes in this case are "directly comparable . . . in all material respects."  As explained in the preceding paragraph, non-surgical control of fertility is excluded equally to both sexes.  On this note, the Court rejects any suggestion to the contrary in *In re: Union Pacific R.R. Employment Practices Litig.*, No. 03-cv-437 (D. Neb. July 22, 2005).  While it is true, as the court noted in that case, that "[c]onception is by definition the fertilization of the ovum, which takes place inside a woman's body," it is not true that "[h]ealth plans that deny coverage for contraception, by definition, affect only the health of women."  Slip. op. at 10.  Merriam-Webster defines "contraception" as the "deliberate prevention of conception or impregnation,"[3] and "conception,"for its part, is defined as "the process of becoming pregnant involving fertilization or implantation or both."[4]  Therefore "contraception" in the sense of "anti-conception" is merely a usage synonymous with "birth control."  Regardless, the process clearly requires the participation of both males and females, and, critically, the process may therefore be prevented by either the male or the female, each of whom is consequently equally affected by the exclusion at issue in this case.  At the very least, the classification at issue here isn't a "lie" or "phony."

---

[3]See http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=contraception&x=13&y=16 (visited August 25, 2005).

[4]http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=conception&x=10&y=12 (same).

Thus we reach the alternative method of establishing sexual discrimination in this case: disparate impact. This argument can be dealt with swiftly. Cummins correctly notes that disparate impact may be established in the absence of discriminatory intent; the crucial inquiry in this case is whether the policy at hand significantly impacts female (Illinois) employees vis-a-vis their male counterparts. Cummins' position is that the impact of the exclusion at hand falls 100% on women and 0% on men. (Doc. 183 at 5). If that were so, of course, one could hardly imagine a more "significant" impact. But it's not true, and here's why. If oral contraceptives are completely excluded under Illinois' plan–an exclusion equally applicable to the spouses of male employees and therefore as "discriminatory" to them as to women employees, see *Newport News*, 462 U.S. at 685–then Cummins' argument is necessarily that *not one* male (Illinois) employee exists whose covered spouse would claim benefits under this plan for oral contraceptives if such a benefit were available, for only then could the exclusion have a 100% impact on women and none on men. But such an unlikely scenario simply hasn't been established. Moreover, *In re: Employment Discrimination Litig. Against the State of Alabama*, 198 F.3d 1305, 1312-1314 (11th Cir. 1999), explains that the key to proving disparate impact is identifying the characteristics properly included in the groups being compared. Thus, the "female" group in this case must be limited to those female *employees* eligible for health insurance benefits *and* enrolled in such a plan. No one could reasonably argue that Illinois qua employer is responsible for the number of unplanned pregnancies in the population in general, and the exclusion in this case is

irrelevant to the extent that one isn't enrolled in an employer-sponsored health-care plan at all.  What is more, the "male" group to which the female group should be compared cannot consist of *every* male employee; for as stated above, male employees are also affected by the exclusion in this case, even granting Cummins' position, i.e., that the exclusion at issue is limited to oral contraceptives and not "drugs or devices used for contraception" in general, to the extent they have spouses enrolled in the plan who would likewise use or would like to use this method of birth control.  Only upon developing those numbers could a conclusion of any significance be drawn.  Even then, the ratio might be more meaningful if compared to the ratio occurring in the workforce in general, whether defined in local or national terms.  In any event, because Cummins hasn't attempted such a comparison, no reasonable fact finder could find in her favor on this essential element of her case and summary judgment in Illinois's favor must therefore be granted.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).

This ruling makes it unnecessary to address the impact of the Eleventh Amendment on the Title VII theory asserted in this case and the Court therefore declines to address that issue.

For the foregoing reasons defendant State of Illinois' motion for summary judgment (Doc. 167) is **GRANTED** and plaintiff Tana Cummins' motion for summary judgment (Doc. 172) is **DENIED**.  The Title VII claim asserted in this case is therefore **DISMISSED with prejudice**.  Because the standards of liability under Title VII are more liberal than those under the Equal Protection Clause, see *Nanda v. Bd. of Trustees of*

*the Univ. of Illinois*, 303 F.3d 817 (7th Cir. 2002); *Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate*, ___ F.3d ___, No. 04-15044 (9th Cir. Aug. 2, 2005), Cummins' 42 U.S.C. §1983 claim cannot succeed in light of the instant ruling. That claim is therefore **DISMISSED with prejudice** to the extent it seeks injunctive relief from the State of Illinois. Illlinois' motion to strike plaintiff's expert witness (Doc. 119) and Cummins' motion to strike portions of Greg Newton and Carolyn Houston's affidavits from Illinois' motion for summary judgment (Doc. 175) are **DISMISSED as moot**. Illinois' motion for leave to cite additional authority (Doc. 185) and Cummins' motion for leave to cite additional authority (Doc. 187) are **GRANTED**.

**IT IS SO ORDERED**.

**Dated: August 30, 2005.**

                                          **/s/ J. Phil Gilbert**
                                          **J. PHIL GILBERT**
                                          **U.S. District Judge**